In Re Rotavirus Vaccines, appellate number 19-1405. Good morning, your honors. Ashley Bass, on behalf of appellate Merck, Sharp and Doan, I'd like to reserve two minutes for rebuttal. That will be granted. The district court erred in failing to find that plaintiffs should be bound to arbitration clauses contained in contracts that control their purchase of pediatric vaccines from group purchasing organizations that contract with Merck on their behalf. I think we're familiar with the circumstances that lead us all here. I'd like to take it back to district court for a moment. Merck didn't ask for discovery until after it did not prevail in its motion to compel. What changed that caused Merck to believe it needed discovery now in order to make its argument when it proceeded to move without it? So Merck was following the framework laid out in Giudotti, which is so long as arbitration is apparent from the face of the complaint, including the materials that are integral to or relied on in the complaint, then the party can move for arbitration through a motion to compel and that the 12B6 standard would apply to that motion. So the contracts that are at issue here, there's four contracts that are at the heart of the case, the group purchasing organization contracts and the membership contracts. Merck's position was that those are referenced and incorporated into the complaint and thus the 12B6 standard was appropriate for the motion to compel. Now once the court decided to respond to convert that motion to a Rule 56 motion, at that point Merck did not have notice of that. The court issued its opinion and at that point Merck requested discovery based off of the court's opinion. So that's the framework of how we got to where we were in terms of the 12B6 and the Rule 56 standard. So what's discovery? I guess this case is a little different posture. Certainly in a different posture than the Singh case was, which is our circuit's most recent precedent building on Giudotti. Because in Singh, the motion to compel arbitration was granted and the complaint was dismissed. But here, this case is still alive. The motion to compel was denied, you had the right to appeal under the FAA, you're in this court but you're also in the district court. What else is discovery going to do here? The district court had all the information as to what you were alleging by agency on estoppel and they concluded that the pediatric practices were not part of the agreement to arbitrate. The district court concluded that without more, it could not decide as a matter of law that Merck has sustained its agency arguments and its ethical estoppel arguments. Wasn't that your burden? You're the ones who want to enforce this agreement that you have with the PBGs. The other side, the practices say, we weren't part of that deal. We never signed any arbitration agreement. And wasn't it that your burden when you made that motion to compel to bring enough evidence forward and the district court found that you didn't? Now you're coming to the court of appeals and saying, we want you to send this back to the district court to give us yet another opportunity to show more than we showed the first time. I mean, how many bites of the apple did you get on this? We think that Giudotti actually answers this question. That if the court cannot find that as a matter of law that the motion to compel arbitration should be granted and that there could be discovery that could help clarify the issues, then discovery is warranted. So the type of discovery here... What discovery? What else are you going to tell the district court? So there's various things that could occur in discovery. So for example, the agency relationship. So the court felt that the membership contracts were not enough and the complaint was not enough to establish the agency relationship. So there could potentially be further discovery on agency that could be had. There could be further evidence of potentially communications between the PBGs and their members, potentially other written materials that we're not aware of, other indicia of agency that could exist here. So are you talking about an indicia of control between the principal and the agent to demonstrate that the principals, i.e. the practices, had control over their agents, the PBGs, in making whatever deals or things that would be necessary to perfect those deals. Is that what you're talking about? Correct. So the GPO organization inherent with it and within it is that it is acting on behalf of its membership. But to the extent that there could be further discovery that could help shore up the notion that an agency relationship existed here, then those are the kind of things that we could explore in discovery. But I guess my point is, Guidotti was decided in 2013. You should have known all that when you made your motion to compel arbitration. We did under the 12V6 standard. We had no notice that the court was going to convert the 12V6 motion to a Rule 56 motion. That's what Guidotti teaches us, in our opinion, is that you are allowed to move under 12V6. And then if the court cannot find, as a matter of law, that you have sustained your burden in order to compel arbitration, the next step is discovery. The next step is not to deny the motion. And that's what we saw. After the motion was denied in the district court, we saw discovery on two occasions very shortly thereafter. The district court did not rule on those requests. Therefore, we took this as our right to appeal. But we did request discovery once we became aware. So those requests for discovery are still pending before the district court? The district court did not act on them. They didn't act on them. Didn't the district court deny one of the motions? Basically what the district court did was the plaintiffs moved in order to open discovery after the court denied the motion to compel arbitration. And the court said, no, you all now have jurisdiction. And so he wasn't going to entertain any further discovery discussion. Aren't there questions as to whether or not the district court properly denied requests for discovery or granted requests for discovery reviewed by us under an abuse of discretion standard? To the extent that the court made any clear errors in going about making that determination, and we would say that your review is plenary, here the standard is set forth in GIADOTTI. So by not following that standard, that requires de novo review by you all. It's not an abuse of discretion issue here. It's almost a binary choice that the court faces, that once the 12B6 motion is denied, if the court doesn't give the opposing side notice that it intends to treat the matter as a Rule 56 matter. So let me make sure I understand, because we have two forums here. You're up here, and this case came out of New Jersey, right? Eastern District of Pennsylvania. Eastern District of Pennsylvania, Judge Joyner. You're on two floors in the same building. You have two cases on two floors in the same building. So if we send this case back, this is going to be like the third request that Judge Joyner has to give discovery. No, Your Honor, we didn't request discovery. Because you have the other two sitting there already. But he did not act on them. We couldn't waive our rights to an appeal. We couldn't run out of time. I mean, we made the request for discovery at the end of the motion process. He did not act on them. We needed to be able to file the appeal in order not to waive it. So and then, like I said, the plaintiffs moved to open the case. They moved to open discovery. They moved to have things proceed. And he said no, that he was divested of jurisdiction. And you all now have jurisdiction. So there's nothing pending before Judge Joyner currently. Is there a, because all I saw on the docket was an order denying the motion to open discovery, plaintiff's motion. Did he issue an opinion that said, I think I'm without jurisdiction? I just don't remember seeing it on the docket. That was my understanding of his order. I think there might have been a footnote in it that said that it was his understanding that he was divested of jurisdiction. Okay, so let's go back to the proceed, because I don't remember seeing a footnote or an explanation for the justification of the order. But putting that aside, if I understand you correctly, you filed a 12B6, you and your folks on the appellants filed a 12B6 motion. The district court did not give notice pursuant to Rule 56, it was going to do a conversion. It does a conversion. And it was only at that moment did you realize that the district court was not satisfied with the evidentiary record. Correct? And then it was after that, that there were letters written to the district court saying, okay, now that you've converted it and you want to consider facts, we want to do discovery. And the district court didn't grant or deny discovery, just didn't allow the opening of discovery. It didn't act in time. It came to time for us to file our appeal. We filed our appeal. And then at that point, the plaintiffs asked to open full discovery in the case, and the court said no. So could this case be resolved as simple as a procedural defalcation of Rule 56? You didn't give us notice? It's possible, Your Honor. I mean, we think that the Rule 12B6 standard is satisfied here. We've certainly explained that in our briefings under both the agency argument and the equitable estoppel argument. This is the alternative argument, though, that to the extent that the court doesn't think, as a matter of law, that the agency arguments and the equitable estoppel arguments can be sustained on this record, then yes, we would say that we would need, in order to go back down to the district court and to conduct discovery on these issues, and this is what Giudotti tells us, then we're allowed to make a renewed motion to compel before the district court to allow the district court to consider that record. So in essence, you want us to consider this first under the Rule 12B6 standard, and you have argued that your agreement with the PBGs requires arbitration for the practices. Correct. Okay, and so you want us to look not only at the complaint, which they have filed, but you want us to look at the agreement that you've entered into with the PBGs, correct? Correct. Okay. So you've, in effect, argued everything that you have to argue. You've argued it in full, and we have everything that the district court's going to have if we say that, geez, when they switched to Rule 56 standard, they should have given you discovery. That doesn't make any sense to me. Well, Your Honor, no discovery has occurred. I understand that, but does it mean, it seems to me that your arguments conflict with one another. If we decide the first, there's nothing, if we decide the first against you, it doesn't seem to me that there's any reason why we should consider the second argument that you're entitled to more discovery. Well, I think the question would be whether or not we have satisfied the requirements under Pennsylvania law for agency requirements and for equitable estoppel. Right, but if we say no, if we say no, if we disagree, there is no agency here, either actual or apparent. There is no equitable estoppel. If we say no, as a panel, why are we going to give you more time to fight this question on arbitration in the district court? Well, again, Your Honor, I think we would first say that you shouldn't say no, but to the extent that you, I mean, I think that our alternative argument is that there could be discovery that could further elucidate the issues. If you read the district court's opinion, what the district court said is, without more, he felt like he could not rule in our favor. So this would be an opportunity to be able to look at what more could exist and the issues of agency are certainly an area where further discovery could elucidate the relationship between the PBGs and between their members. Do you think the district court made a mistake in terms of its analytical framework for equitable estoppel? Yes, Your Honor. The plaintiffs have admitted that. And do you think we need to, we would need to remand, even if, regardless of our view on agency, do you think we have to remand so that they can, so the district court can apply the proper test of equitable estoppel on this case? I think you all can certainly apply the proper test here. The issues that are With or without, so we don't need any more discovery, I think is Judge Fischer's point. You're saying the record is sufficient, we could decide. Yes. I mean, that is, the record is sufficient. I mean, and this is certainly, there are other cases before the court that have proceeded this way. So, for example, in the Sanford case, that was also a situation where in the court below, the district court applied a Rule 56 standard and determined that the wife couldn't necessarily find an agency relationship or that she directly benefited such that she should be bound to the arbitration clause. When it got to the Third Circuit, as you all know, you applied a 12B6 standard. You said, based off of the documents that existed, including the retention letter with the law firm there, that the 12B6 standard was appropriate. What about this fact that we have a circumstance, if we went to equitable estoppel? We have affidavits that were submitted with a surreply, I think, that the practices said we knew nothing about the arbitration clause. Well, Your Honor, we certainly think, you know, Curliss is the only case that the plaintiff's relying upon to claim that knowledge is a necessity in order for equitable estoppel to apply. No case post-Curliss has applied Curliss in that manner. But isn't Curliss also using a different estoppel doctrine? It's using a reliance doctrine? Correct. Exactly, Your Honor. So, Curliss isn't applicable here. Correct. And a case like Sanford would be much more applicable where the court did find an equitable estoppel applied with no need to look into the knowledge issues in the case at all. And I see my time is up. All right, we'll have you back on the button. Thank you. Thank you. Good afternoon, Your Honors. Daniel Walker on behalf of the plaintiffs' appellees. I'm going to jump in on the Godotti point first and then go back to some of the others, if you don't mind. I think we heard just now that Merck does not believe that discovery is necessary to resolve its motion to compel arbitration. And we know this because Merck told the court that the various contracts submitted were sufficient to decide the issues. And we know that because they argue that the plaintiff's declarations, the plaintiff's knowledge is irrelevant to the issues of agency and equitable estoppel. And Merck never requested any discovery on knowledge or the contracts or anything else until after it lost in the district court. And that distinguishes this case from Godotti, where there the defendant made an initial showing of arbitrability. But there remained a clear, narrow, factual dispute about the central fact of arbitrability, which there was whether the plaintiff had received the arbitration agreement. And there the plaintiff had introduced some evidence. So the court found that under the Rule 12, this court found that under the Rule 12 standard, the defendant would have won based on their showing. And the plaintiff introduced some evidence to call into a specific, narrow, factual dispute that had to be resolved before the issue of arbitrability could be resolved. Here, Merck has made no initial showing of arbitrability, unlike the defendant in Godotti. And in fact, Merck concedes that there is no narrow, factual dispute to here is premised on this idea that the court has everything in front of it. It needs to resolve the issue. And does the court. Let's talk about what's in front of us. And you'll have to bear with me because I want to just lay out a couple of bits that come from the various agreements. As I understand it, the agreement between CCPA, which is one of the practices, and the PPG says the purchases are made in accordance with the vendor contract. We know the vendor contract is the PPG-Merck agreement. If it's made in accordance with that agreement, it's in accordance with its terms, which include an arbitration clause. And just give me a second to just run through these facts. The next one is in the Main Street contract with the PPG. It says the clinics must meet the terms of the Merck contract. We just talked about what the Merck contract is, which includes an arbitration clause. So we have that bit of information, then the next set of agreements I want to talk to you about is Schedule F to the Merck contract, which says, here are a bunch of obligations that are imposed on the eligible clinics, which I understand to be the practice groups. Maintain confidentiality, make available data, use the drugs as administered pursuant to medical judgment, give notice if there's a death, hold Merck harmless. All of those obligations go from the Merck agreement with the PPGs, it appears, to the obligations flow. Why doesn't the arbitration requirement flow? Well, I would say there are a number of answers to that question. To the extent where we're talking about agency and whether the PPGs were agents, we say in the first instance, the physician buying groups, the PPGs were not agents. They weren't fiduciaries of the members. They weren't, the members did not have the right to control the physician buying groups interaction. Where's the evidence that says they don't have the right to control? This goes back to a question I asked your adversary. Where's the evidence that says they don't have a right to control when it appears they had the authority to make purchases when they entered these agreements with the vendor on behalf of the practices? I'm sorry to say that. My question is, you say they had no right to control. I don't know how you can say that based on this record where the language of the PPGs to negotiate with the vendor to get them the good prices from their point of view. So let's take a step back to the member agreements first that you talked about. I want to go through each of those. The Main Street Vaccines Agreement, which starts at J141, it says it's an agreement between the doctor's office and Main Street Vaccines to participate as a member practice in a vaccine purchasing contract with Merck, the terms and conditions of which are, and then it gives some terms and conditions, doesn't mention every term and condition in the physician buying group agreement with Merck, doesn't mention arbitration, doesn't mention a lot of terms in the PPG contracts with Merck that clearly don't apply. But the Merck agreements voice backwards onto the PPGs to the clinics. So there's two. I think you have to read this collection of agreements together. I agree with that. And I think that reading them together, it shows both that there was no agency relationship in the first place. Right. The so and to the extent there was an agency relationship, and I would like to get back to that point, there was no authority for the physician buying groups to go out and bind the plaintiffs to terms that were not disclosed. Right here. They and they end this right before the signature saying in so doing, he or she accepts the terms and conditions offered, which refers back to the terms and conditions that are disclosed in this contract. There are a couple addenda to this buying group agreement that mentioned prices and loyalty and that sort of thing. But there's no evidence that the plaintiffs ever delegated any authority to Main Street vaccines to go out and negotiate a contract with dozens of terms that would bind them that they had. At that point, wouldn't additional discovery perhaps shed some light on the question of control that isn't otherwise already in the record? Well, I would say so. So this gets back to the question of the existence of the agency relationship. Right. And and Judge Joyner made the holding that the physician buying groups were not agents because under Pennsylvania law, there has to be a deliberate and specific grant of agency authority. And and in these physician buying groups, contracts with with the doctors, there is no such authority. I would say even in Pennsylvania, even more important than control is the fiduciary status. You look at the Basile case we cited where H&R Block was found not to be an agent of its customers, even though it was going out and conceitedly doing things on behalf of their customers. They went out and arranged financing, short term loans with a financial institution and offered it as sort of a checkbox, something that the customer could could agree to. And they said, we'll go out and arrange the deal with the banks on your behalf. But let us know if you want to. And the court said that is not an agency relationship. That is not establishing a fiduciary relationship. In fact, it's the opposite. That sort of take it or leave it. Here's a deal we arranged for you shows there was no delegation of authority to that entity to go out and bind them to with the third party. I would say the CCPA agreement with the plaintiffs, the CCPA member agreement is written in the same way. It says there's no obligation to participate in any of these vendor agreements. We'll come back to you with the terms and conditions and you can decide whether to participate. But at JA 145, it says purchases are made in accordance with the vendor contract. Right. But it says GPO will notify provider of the vendor arrangements available for time to time and the applicable terms and conditions of such arrangements. So, again, we think this is not the kind of thing that establishes a fiduciary relationship. And in fact, you keep talking about fiduciary. My understanding of the three elements of Pennsylvania law and agency are a manifestation that I want you to act for me in acceptance. I will act for you in control. We keep talking about fiduciary. Oh, under Pennsylvania law, it's no doubt that, I mean, the Basile case, which is Pennsylvania Supreme Court, said an agency relationship is a fiduciary one and the agent is subject to a duty to act only for the principal's benefit. And there the Pennsylvania Supreme Court said. And isn't that what happened here based on the contractual language? Absolutely not. The PBGs were acting for their own benefit. They have. They definitely got a benefit, but so did the practice groups with the discount. I recognize you have a claim that it becomes a competitive. I get that. Right. And Basile mentions when there's this give and take like that between two parties, they're governed by what they call the morals of the marketplace. They are not governed by the heightened fiduciary duty. So don't we go back to Judge Fischer's question, shouldn't we allow for some discovery to get a real understanding of what the practice groups agreed to allow the PBGs to do for them? And I would say no for two reasons. One is that Merck hasn't addressed in any of this briefing the fiduciary element, which under Pennsylvania law is the core element of agency. If you look at Merck's briefs in this, they never even use the word fiduciary as far as I can tell. They've put forth no evidence. Number two, Guidotti is about whether the defendants made an initial showing of arbitrability and whether the non-movements introduced some evidence that called into question a narrow factual dispute that had to be resolved in order for the issue of arbitrability to be resolved. That was the same, too. Right. That was the essence behind the Singh decision. And there it had to be resolved through narrow focused discovery. So let's put aside agency for a moment and let's turn to equitable estoppel and alternative ground. I think there's no disagreement among counsel that the district court applied an incorrect test. Applying the correct test, isn't there enough in this record to demonstrate that there should be equitable estoppel? No, we definitely do not think so. And I'll tell you why. Merck primarily relies on a line of cases, the direct benefits, a line of estoppel cases. And Tenkara was sort of the first of the ones they rely on. But it's Amcor, Bayonne, Dry Dock, Blaustein and Hellenic Investments. That's sort of the spectrum of cases. In order to understand why direct benefits estoppel doesn't apply here, you have to situate that line of cases in the facts and the context. And all of those cases involved a contract for services that was entered into for the benefit of and at the behest of the non-signatory. And critically, the underlying lawsuit there was over the failure to perform services for the non-signatory's benefit. So the key was in all of those decisions that the non-signatory was the real intended beneficiary and the direct benefit there arose from the failure to provide services. So there's two beneficiaries under this transaction, right? The PPG's got whatever administrative fees they received for bringing in these practice groups to Merck to buy the product. But also the practice groups got, from Merck's point of view, this discounted and access to certain types of products. So we have two beneficiaries directly benefited by the Merck PPG agreement in which the arbitration clause exists. So doesn't that frame apply here? No, it doesn't apply. And I mean, first of all, I want to put aside the question of whether those were real benefits, which was briefed. But the key to these direct benefits cases was that the underlying lawsuit where the part, the non-signatory was trying to avoid arbitration was over the failure to provide benefits for that non-signatory. Here, plaintiffs aren't saying that Merck and the PPG's failed to provide any benefits. Merck and the PPG's, if they perform the contract, that was to the plaintiff's detriment. And I want to draw the court's attention to two quotes in these cases. Can you clarify that for me? Are you saying the physicians obtained no benefits at all as a result of the work that the PPG's are doing? I'm making two points. One is I would say that the physicians were not benefited by the PPG Merck contracts because those contracts increased the prices above the level they were at, they would have been at, but for these contracts. You would have been paying higher prices than if you had independently obtained the vaccines yourself. Is that accurate? Under Merck, I would say this way, the antitrust claim is Merck has monopolized the vaccine market by introducing these contracts, which caused both the PPG members and the non-members to pay higher prices. In the absence of these contracts, everyone would pay lower prices. So the contract didn't benefit the plaintiffs here. But I want to make another point that is even more critical about these direct benefits estoppel cases, which is that the key to those cases was that the lawsuit was about a failure to perform under those contracts that had the arbitration clauses that were for the benefit of the plaintiffs. The lawsuit was over the failure to perform. And I want to draw the court's attention to DuPont and footnote seven. The court said in discussing this line of cases, we cannot help but note that many of these cases resemble the third party beneficiary cases. And they referenced Tenkara. And then in Hellenic Investments, which Merck cites, the court there says the very nature of the claim brought requires that the signatory's performance under the contract be for the non-signatory's benefit. And the court then went on to find that the non-signatory there stated a claim that expressly requires that the signatory's performance be for the non-signatory's benefit. Having stated that claim, the non-signatory cannot avoid the estoppel implications of its position. That whole line of cases is about if you are suing as a beneficiary but non-signatory under that contract over the failure to perform on that contract, then you cannot then come and say, well, that contract doesn't apply to me at all. That's the direct benefits cases. And that's not what we're doing here. And I would say on the last point about Stanford, I think Stanford stands for the very logical problem. I mean, Stanford was a breach of contract case. That's what this court said. This court basically said, and I should say the plaintiff non-signatory there also claimed to be a third party beneficiary. And Stanford said, you can't both come in and say you're not bound by this contract, but you're benefited and contributed. You can sue on this contract. That, again, is not what we're doing here. We are not suing to enforce any rights granted by these Merck PBG agreements. The ultimate position is you've got no benefit whatsoever as a result of your position with regard to the contract. I would say our ultimate position is both that we did not receive benefits, but that our lawsuit here is not about the failure to provide any benefits under the contract, which is the key focus of those direct benefits estoppel cases. I see I'm out of time. Thank you very much. So, Your Honors, in terms of the equitable estoppel argument, the contract here between the PBGs and Merck is the contract that controls the prices the plaintiffs pay. Those prices are reduced. They are less than what the plaintiffs would have paid if they had bought not on the contract. If they had bought a list, they would have paid more. That's not a proposition that the plaintiffs have disputed. Thus, there is an actual benefit, a direct benefit that results from the PBG and Merck contract that flows to plaintiffs. Now, plaintiffs might try to claim that that price should have been even lower. That's a merits question, but that's a question for the arbitrator to decide. Walker is incorrect when he says he got no benefit as a result of the contract. That is right, Your Honor. Not only is he incorrect that they received no benefit as a result of the contract, their claims here are based directly on that contract. Thus, the plaintiffs here satisfy both prongs of the equitable estoppel test in the Third Circuit. They satisfy both the receiving benefits prong and a directly based on prong. Could you briefly describe the flow of the payments, how that works? And I understand there's a commission back that is paid to the to the PBG group. Is that correct? So the way that the payments could work is that the members would purchase pediatric vaccines on a quarterly basis. There'd be some determination about how many vaccines the members had purchased. And then based off of the amounts that are in the contract, the PBGs would receive some percentage amount as an administrative fee. That amount has to be disclosed to the members. There are federal statutes that control, anti-kickback statutes that control the communication of that percentage to the members. The members are aware of it. The members buy directly from Merck. They buy directly from Merck at the price set forth in the contract. And that's what they are now challenging. They're saying that those prices were too high. So the contract is when they go to trial in this case, this is the contract that will be their proof. It will be the contract that determines their price. It will be the contract that they put forth to the jury to say this was too much. That is the contract that controls the arbitration clause. That is the benefit of the bargain that was struck here by the GPOs on their behalf. Does these plaintiffs satisfy both pawns of the equitable estoppel test? I see I'm out of time. All right. Thank you very much. Thank you both for a well-argued and well-briefed case. We'll take them.